Paul Ewers (Alaska Bar #8711081)
City Attorney
Danielle Pensley (Alaska Bar #1406054)
Deputy City Attorney
800 Cushman Street
Fairbanks, AK 99701
Tel.: 907.459.6750
Fax: 907.459.6761
E-mail: pewers@fairbanks.us
E-mail: dpensley@fairbanks.us

Richard W. Head (NH Bar #7900) (*pro hac vice application pending*)
SL ENVIRONMENTAL LAW GROUP PC
201 Filbert Street, Suite 401
San Francisco, CA 94133
Tel.: 415.348.8300
Fax: 415.384.8333
E-mail: rhead@slenvironment.com

Kevin J. Madonna (*pro hac vice application pending*)
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road
Hurley, NY 12443
Tel.: 845.481.2622
Fax: 845.230.3111
Email: kmadonna@kennedymadonna.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT ALASKA

| | |
|---|---|
| CITY OF FAIRBANKS, ALASKA,<br>　　　　Plaintiff,<br><br>　　v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); TYCO FIRE PRODUCTS LP (successor-in-interest to Ansul Co.); JOHN DOE DEFENDANTS 1-49,<br>　　　　Defendants. | CIVIL ACTION NO.<br><br>DEMAND FOR JURY TRIAL |

# COMPLAINT

## I.  INTRODUCTION

1.  Plaintiff, City of Fairbanks, Alaska ("Plaintiff" or "the City") brings this action to recover the costs necessary to protect the public health, safety, and welfare; safeguard the environment; comply with applicable soil and groundwater cleanup standards; extend the public water system to properties where drinking water has been contaminated; and prevent further contamination of drinking water supplies by monitoring the groundwater and eliminating contamination in soil and groundwater caused or created by Defendants' products, including but not limited to aqueous film-forming foam ("AFFF").

2.  Defendants, 3M Company ("3M") and Tyco Fire Products LP ("Tyco") (collectively referred to as "Defendants") developed, marketed, manufactured, distributed, and sold AFFF, a firefighting agent used for fighting Class B fires. The Defendants' AFFF was used for firefighting exercises at a burn pit located at the Fairbanks Regional Fire Training Center ("RFTC") in Fairbanks, Alaska.

3.  AFFF manufactured by 3M contains perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA") and their precursors. AFFF manufactured by Tyco does not contain PFOS or PFOS precursors but does contain PFOA and PFOA precursors. Both PFOS and PFOA fall within a class of manmade chemicals known as perfluoroalkyl and polyfluoroalkyl substances ("PFAS").

4.  3M and Tyco knew or should have known that PFAS are mobile and persistent when released into the environment and constitutes significant risks to groundwater, drinking water supplies, and human health.

5.  3M developed, marketed, manufactured, distributed, and sold AFFF, including in Alaska and this District, with the knowledge that PFAS would be released into the environment as part of firefighting exercises.

6.  Through this action, the City seeks compensatory damages for injury to its property, including but not limited to soil and groundwater, and for the diminution of its property's value; for the costs to investigate, remediate, and monitor PFAS levels at the RFTC and in the soil and groundwater contaminated by the historical use of AFFF at the RFTC; for the reimbursement of regulatory oversight; for the costs of bottled water delivery to affected residents; for the costs associated with connecting businesses and residences to the public water system where the groundwater beneath private property has become contaminated with PFAS, including but not limited to the expenses of design, engineering, construction, and hookup fees; for the payment of water stipends; and for the costs of this suit (including expert fees) and reasonable attorneys' fees. The City seeks also punitive damages against Defendants and declaratory relief.

## II. PARTIES

7.  The City is a duly incorporated body politic and corporate under the laws of the State of Alaska, with its primary address at 800 Cushman Street, Fairbanks, Alaska 99701.

8.  Defendant 3M (f/k/a Minnesota Mining and Manufacturing Company) is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

9.  Beginning before 1970 and until at least 2002, 3M developed, marketed, manufactured, distributed, and sold AFFF containing PFAS.

10. Only AFFF which was manufactured and sold by 3M contained PFOS.

11. 3M manufactured, distributed, and sold AFFF containing PFAS, in Alaska and this District, which was then distributed and used for firefighting exercises at the RFTC.

12. Defendant Tyco is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange. Tyco is the successor-in-interest of the Ansul Company ("Ansul") having acquired Ansul in 1990.

13. Beginning in or around 1975, Ansul developed, marketed, manufactured, distributed, and sold AFFF containing PFAS, including but not limited to PFOA, in Alaska and this District,. After Tyco acquired Ansul in 1990, Tyco continued to develop, market, manufacture, distribute, and sell AFFF containing PFAS.

14. Tyco manufactured, distributed, and sold AFFF containing PFAS in Alaska and this District, which was then distributed and used for firefighting exercises at the RFTC.

15. Upon information and belief, John Does 1-49 were manufacturers, distributors, or sellers of AFFF. Although the identities of these defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as defendants.

### III. JURISDICTION AND VENUE

16. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

17. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. PFOS and PFOA

18. PFAS have been used in the manufacture of, among other things, carpets, clothing, upholstery, food packaging, and a variety of materials such as nonstick coatings for cookware, for instance Teflon, which are resistant to water, grease, or stains. This class of manmade chemicals is found also in AFFF and is used in many industrial processes.

19. PFOS and PFOA are characterized by a carbon-fluorine ("C-F") bond which does not break down or degrade once released in nature.

20. PFOS and PFOA are extremely stable and resistant to metabolic and environmental degradation.

21. PFOS and PFOA are extremely persistent in the human body and the environment; they bioaccumulate and biomagnify in humans and wildlife.

22. PFOS and PFOA are water soluble and migrate readily from soil to groundwater, in which they may be transported long distances.

23. PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

24. Typical municipal water treatment plants do not remove, filter out, or treat PFOS or PFOA from the water they process.

25. PFOS and PFOA can cross the placenta from mother to fetus and may be passed to infants through breast milk.

26. Above certain concentrations, human exposure to PFOA or PFOS, or PFOA and PFOS combined, may result in certain health effects including, but not limited to: (a) kidney

cancer, (b) testicular cancer, (c) developmental effects to fetuses during pregnancy or to breastfed infants, (d) liver effects, (e) immune effects, and (f) thyroid effects.

27. The International Agency for Research on Cancer has concluded that PFOA is possible carcinogenic in humans.

28. AFFF which contained PFAS, including PFOS and PFOA, or which contained precursors to PFAS, was developed in the 1960s to extinguish jet fuel fires as an alternative to existing protein-based firefighting foams.

29. 3M manufactured AFFF through a proprietary process called electrochemical fluorination. This AFFF contained both PFOS and PFOS precursors. Because 3M was the only chemical company utilizing electrochemical fluorination, its AFFF was the only such product on the market containing PFOS. 3M's AFFF also contained PFOA.

30. Different formulations of AFFF which were manufactured by other chemical companies, including but not limited to Tyco, were synthesized through telomerization and contained PFAS including PFOA. Both electrochemical fluorination and telomerization rely upon formulations containing precursors of PFOS, PFOA, and other PFAS chemicals.

31. As early as 1970, the Qualified Products Database of the U.S. Department of Defense listed AFFF products which were manufactured by 3M.

32. Upon information and belief, although Defendants provided instructions, labels, and material safety data sheets with AFFF for its end users, at least at significant times these instructions, labels, and material safety data sheets did not fully describe the health and environmental hazards of AFFF of which the Defendants knew or should have known.

33. Upon information and belief, 3M knew or should have known of the health and environmental hazards of AFFF for more than a half century.

34. Throughout the 1950s, 3M's own internal animal studies consistently concluded that PFAS are "toxic."

35. 3M knew as early as the mid-1950s that PFAS bio-accumulates in humans and animals.

36. A 1956 study at Stanford University concluded that the PFAS manufactured by 3M binds to proteins in blood.

37. By the early 1960s, 3M understood that PFAS are stable, persist in the environment, and do not degrade.

38. In 1970, the authors of a scientific journal article observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

39. Studies undertaken by 3M in the 1970s demonstrated that PFAS was even "more toxic than was previously believed."

40. According to a deposition transcript from a lawsuit by the State of Minnesota against 3M for damages to the state's natural resources from PFAS (No. 27-cv-10-28862, 4th Judicial Dist. Ct. Hennepin Cty.) ("Minnesota Lawsuit") 3M began monitoring the blood of its employees for PFAS as early as 1976 because the company was "concerned" about the "health" effects of PFAS. 3M documents from 1977 regarding this monitoring further confirmed that PFAS bioaccumulate.

41. A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

42. In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

43. According to the allegations presented in the Minnesota Lawsuit, despite that 3M understood the risks associated with PFAS, the chemical company engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

44. According to a deposition transcript from the Minnesota Lawsuit, 3M recognized that if governmental regulators and the public became aware of the risks associated with PFAS, 3M would be forced to cease manufacturing PFAS and PFAS-derived products, which would result in the loss to the company of hundreds of millions of dollars in annual revenue.

45. The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

46. A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

47. In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when and whether these papers were published at all.

48. A significant aspect of 3M's campaign to influence scientific research involved the relationship of 3M with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript from the Minnesota Lawsuit, he privately characterized himself as a

member of the 3M "team."

49. According to Professor Giesy's deposition transcript from the Minnesota Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

50. According to emails produced by Professor Giesy in the Minnesota Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time doing so. Professor Giesy further stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

51. Despite spending most of his career as a professor at public universities, Professor Giesy revealed in his deposition from the Minnesota Lawsuit that he has a net worth of approximately $20 million which is in part, according to the Minnesota Attorney General, a direct result from his long engagement with 3M for the purpose of suppressing independent scientific research on PFAS.

52. 3M marketed and promoted its AFFF products, including in Alaska and this District, with the assistance of industry funded trade groups including the Fire Fighting Foam Coalition.

53. Under pressure from the EPA, 3M announced on May 16, 2000 that it would phase out production of products that contain PFOS and PFOA, partly due to their bio-persistence.

54. 3M, the predominant manufacturer of AFFF, ceased production of PFAS-based AFFF in 2002.

9

Case 4:19-cv-00013-JWS   Document 1   Filed 04/26/19   Page 9 of 20

55. An internal EPA memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term . . . . *[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree*." (Emphasis added.)

56. On May 25, 2016, EPA issued a notice of its revised lifetime health advisory ("LHA") for PFOS and PFOA as follows: "0.07 parts per billion (70 parts per trillion) for PFOS and PFOA. Because these two chemicals cause similar types of adverse health effects, EPA recommends that when both PFOS and PFOA are found in drinking water the combined concentrations of PFOS and PFOA be compared with the 0.07 part per billion HA level."

57. On August 20, 2018, the Alaska Department of Environmental Conservation ("ADEC") issued a Technical Memorandum to provide "consistent guidance on responding to [PFAS] in groundwater and surface water, and to establish health-based action levels for drinking water." No maximum contaminant level had been established for PFAS compounds under the Safe Drinking Water Act, but ADEC considered the following PFAS compounds to be hazardous substances: PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFBS. The Technical Memorandum stated that the action level for PFOS, PFOA, PFNA, PFHxS, or PFHpA was 0.07 μg/L (*i.e.*, 70 parts per trillion) for the sum of the concentrations for all detected compounds. For PFBS, the action level was 2.0 μg/L (*i.e.*, 200 parts per trillion).

58. On April 9, 2019, ADEC issued an updated Technical Memorandum "[i]n order to align state actions to the recently announced EPA plans . . . ." The updated Technical Memorandum states that the action level is 0.07 μg/L for PFOS and PFOA only. ADEC has

stated that, notwithstanding the updated Technical Memorandum, those who began receiving drinking water prior to April 9, 2019, based on the action level for any of the substances described in the August 20, 2018 Technical Memorandum, will continue to receive water.

### B. Fairbanks Regional Fire Training Center

59. The Fairbanks Regional Fire Training Center ("RFTC") is located at 30th Avenue and Lathrop within city limits. Constructed in 1987 as a state-owned facility, the burn pit at the RFTC was used for firefighting exercises for about twenty years. These exercises involved filling the pit with water, floating petroleum products (*e.g.*, jet fuel, diesel fuel, and/or gasoline) on the water, igniting the fuel, and extinguishing the ensuing fire by flowing foam over it.

60. In 2014, to prepare the pit for decommissioning, ADEC sampled the standing water and sediment in the pit; petroleum and PFAS compounds were detected in the water. ADEC recommended further site characterization.

61. In 2015, upon ADEC's approval of its work plans, the City contracted for the excavation of the burn pit at the RFTC and removal of the contaminated soil to a certified landfill. The City worked closely with the ADEC Division of Spill Prevention and Response throughout the entire cleanup process.

62. After the initial discovery of contamination at the RFTC burn pit and its subsequent remediation, the City began identifying and testing both extant monitoring wells and drinking water wells in the vicinity of the RFTC. It provided bottled drinking water free of charge to the residents of properties testing above the LHA until permanent water service connections to the public water system could be established.

63. Since that time, the City has searched iteratively for contamination away from the RFTC in the general direction of the groundwater flow (northwest).

64. On September 25, 2017, the Fairbanks City Council adopted Ordinance No. 6060, as Amended ("Ordinance 6060") with an effective date of September 30, 2017. Ordinance 6060 established the criteria by which the City selects and funds permanent water service connections to the public water system for property owners whose wells have been contaminated due to the historical use of AFFF at the RFTC. As paraphrased from Ordinance 6060:

    a. Category 1 properties have wells connected to a structure's interior plumbing, the wells are the structure's only source of drinking water, and the water in the wells is contaminated above the LHA;

    b. Category 2 properties have wells that are not connected to the structure's interior plumbing, the wells are contaminated above the LHA, and a holding tank is currently being used as the structure's source of drinking water;

    c. Category 3 properties have wells that test below the LHA but are above 85% of the LHA, and the wells are the structure's only source of drinking water or a holding tank is currently being used as the structure's source of drinking water; and

    d. Category 4 properties have no well.

65. Public drinking water in the greater Fairbanks area is provided by two privately-held, publicly-regulated utilities operating as College Utilities Corporation and Golden Heart Utilities, Inc., both subsidiaries of Fairbanks Sewer and Water.

66. Ordinance 6060 called also for all Category 1 properties to be connected to the public water system by December 2017 and for all Category 2 and Category 3 properties to be connected to the public water system by September 2018.

67. Finally, the Ordinance provides for all Category 1, 2, and 3 properties to receive a $2,500 stipend to cover the cost of water for approximately two years. These stipends have been paid directly by the City on consumers' accounts with College Utilities and Golden Heart Utilities.

68. The City has funded all costs of investigation, monitoring, abatement, remediation, and regulatory oversight; bottled water delivery to affected residents; design, engineering, construction, and hookups; and the payment of water stipends.

69. The use of Defendants' AFFF at the RFTC has impacted the soil and groundwater in and around the RFTC.

70. The City has suffered damages, including but not limited to: (a) property damage; (b) the costs associated with the investigation, monitoring, abatement, remediation, and regulatory oversight which was necessary due to the contamination of soil and groundwater from PFAS; (c) the costs for bottled water delivery to affected residents; (d) the costs associated with the design, engineering, construction, and hookups of permanent water service connections to the public water system for properties which wells have been contaminated by the historical use of AFFF at the RFTC; (e) the payment of water stipends; and (f) such other damages that the City may prove at trial. The City seeks also punitive damages.

## COUNT I
**Strict Products Liability – Design Defect**

71. Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

72. At all times relevant herein, Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, or selling AFFF containing PFAS, including but not limited to PFOS and/or PFOA.

73. AFFF as manufactured and sold by Defendants, that is, containing PFAS, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because: (a) AFFF as manufactured and sold by Defendants, when used as intended, resulted in the contamination of soil and groundwater with PFAS, thereby creating a significant threat to soil, groundwater, and drinking water supplies; (b) the PFAS contamination will continue for decades or centuries; (c) PFAS are toxic and extremely mobile and persistent in the environment; (d) PFAS contamination, when ingested, will bioaccumulate in the human body; and (e) AFFF as manufactured and sold by Defendants, when used as intended, constitutes significant risk to human health and the environment.

74. Defendants' defective product was more likely than not a substantial factor in bringing about the City's injuries.

75. Defendants knew of the defective nature of the AFFF containing PFAS but they continued to market and sell AFFF which was used for firefighter exercises at the RFTC.

76. Defendants failed to develop and make available alternative AFFF products which were designed in a safe or safer manner, even though such products were technologically feasible, practical and commercially viable, and marketable at the time Defendants introduced AFFF containing PFAS into the stream of commerce.

77. The risk of harm in the form of soil, groundwater, and drinking water contamination from AFFF containing PFAS, which Defendants developed, marketed,

manufactured, distributed, and sold, and the risk to human health and the environment, was reasonably foreseeable or discoverable.

78. As a proximate cause and legal result of the Defendants' action in placing AFFF containing PFAS into the stream of commerce with a design defect, which failed to perform as reasonably expected, the City has suffered and will continue to suffer damages as set forth in this Complaint.

## COUNT II
### Strict Products Liability – Failure to Warn

79. Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

80. At all times relevant herein, Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, or selling AFFF containing PFAS, including but not limited to PFOS and/or PFOA.

81. AFFF as manufactured and sold by Defendants, that is, containing PFAS, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because: (a) AFFF as manufactured and sold by Defendants, when used as intended, resulted in the contamination of soil and groundwater with PFAS, thereby creating a significant threat to soil, groundwater, and drinking water supplies; (b) the PFAS contamination will continue for decades or centuries; (c) PFAS are toxic and extremely mobile and persistent in the environment; (d) PFAS contamination, when ingested, will bioaccumulate in the human body; and (e) AFFF as manufactured by Defendants, when used as intended, constitutes significant risk to human health and the environment.

82. Defendants' defective product was more likely than not a substantial factor in bringing about the City's injuries.

83. Defendants knew of the defective nature of the AFFF containing PFAS but they continued to market and sell AFFF which was used for firefighter exercises at the RFTC.

84. Defendants had a duty to warn the users of AFFF, including Plaintiff, of these hazards. Defendants, however, failed to provide adequate warnings of the scope of the risk or the danger posed by the use of their AFFF, reasonably communicate the extent or seriousness of the harm that could result from this risk or danger, and failed to convey adequate warnings in a manner that would alert a reasonably prudent person to this risk or danger.

85. Defendants' failure to issue the proper warnings about AFFF containing PFOS and/or PFOA affected the market's acceptance of AFFF containing PFAS.

86. Defendants' failure to issue the proper warnings about AFFF containing PFAS prevented the users of the product from treating it differently than other substances with respect to its use and environmental cleanup.

87. Defendants' failure to issue the proper warnings about AFFF containing PFAS prevented the users of the product from seeking alternative products, including but not limited to alternative products for training firefighters in the use of AFFF.

88. As a proximate cause and legal result of Defendants' action in placing AFFF containing PFAS into the stream of commerce without adequate and appropriate warning of the known and reasonably knowable dangers associated with the use of this product, the City has suffered and will continue to suffer damages as set forth in this Complaint.

**COUNT III**
**Negligence**

89. Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

90. Defendants owed a legal duty to Plaintiff. The use of AFFF at the RFTC for firefighting exercises was a reasonably foreseeable use. Defendants knew or should have known that AFFF used in this manner would contaminate soil and groundwater with PFAS, making a significant threat to drinking water supplies. Defendants had a duty to prevent the release of PFAS, including but not limited to PFOS and/or PFOA, in the foreseeable use of their AFFF.

91. Defendants breached their duty when they negligently manufactured a dangerous product, AFFF, negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil, groundwater, and drinking water supplies.

92. As a direct and proximate cause and legal result of the Defendants' breach of their duty, the City has suffered and will continue to suffer damages as set forth in this Complaint.

## COUNT IV
## Contribution

93. Plaintiff repeats and restates the allegations set forth in all the previous paragraphs of this Complaint as if fully set forth herein.

94. The City has incurred costs as set forth in this Complaint for response actions demanded by the State of Alaska (the "State"). As the owner of a facility where regulated PFAS compounds have been released, including but not limited to PFOS and/or PFOA, the City is liable to the State without regard to fault. As such, the City has incurred and will continue to incur costs without regard to liability and without having performed any negligent act.

95. As a direct and proximate cause and legal result of Defendants' defective product, Defendants' failure to warn and\or Defendants' negligence, the City is entitled to contribution for (a) property damage; (b) the costs associated with the investigation, monitoring, abatement, remediation, and regulatory oversight which was necessary due to the contamination of soil and

groundwater from PFAS;  (c) the costs for bottled water delivery to affected residents; (d) the costs associated with the design, engineering, construction, and hookups of permanent water service connections to the public water system for property owners which wells have been contaminated by the historical use of AFFF at the RFTC; (e) the payment of water stipends; and (f) such other damages that the City may prove at trial.

## COUNT V
## PUNITIVE DAMAGES

96. Plaintiff incorporates the allegations contained in all prior paragraphs of this Complaint as if fully stated herein.

97. At all times pertinent hereto, the conduct of Defendants in causing, permitting, and allowing the release of PFAS into the environment, thereby contaminating the City's property and the groundwater that supplies drinking water, was more than simple negligence, momentary thoughtlessness, inadvertence, or error of judgment on the part of Defendants. Instead, Defendants' conduct was outrageous, including acts done with malice or bad motive, or was the result of reckless indifference to the interest of another person.

98. Pursuant to AS § 09.17.020, the City is entitled to recover punitive damages in an amount authorized by the statute.

## COUNT VI
## Declaratory Judgment

99. Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

100. There is an actual and present controversy between the parties as to Defendants' liabilities and responsibilities for contamination at and from the RFTC. The Court should resolve this controversy by means of its equitable power to enter declaratory judgment pursuant to the provisions of 28 U.S.C. § 2201.

101. Plaintiff requests judgment declaring Defendants liable for the City's past and future response costs and damage to real and personal property arising out from the AFFF contamination at and from the RFTC.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A. Enter judgment in its favor and against Defendants on each Count of this Complaint;

B. An order that Defendants pay all damages suffered by the City as set forth in this Complaint, including but not limited to: (a) property damage; (b) the costs associated with the investigation, monitoring, abatement, remediation, and regulatory oversight which was necessary due to the contamination of soil and groundwater from PFAS; (c) the costs for bottled water delivery to affected residents; (d) the costs associated with the design, engineering, construction, and hookups of permanent water service connections to the public water system for property owners which wells have been contaminated by the historical use of AFFF at the RFTC; (e) the payment of water stipends; and (f) such other damages that the City may prove at trial.

C. An order that Defendants contribute their equitable share of any costs that have been or will be incurred by the City in response to demands by the State.

D. A declaratory order that Defendants are liable for the City's past and future response costs and damage to real and personal property arising out of the AFFF contamination at and from the RFTC.

E. An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees.

F. An award for punitive damages; and

G. An award for such other and further relief as the nature of this case may require or as this court deems just, equitable, and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

CITY OF FAIRBANKS,
By Their Attorneys,


*/s/ Paul Ewers*
Paul Ewers (Alaska Bar #8711081)
City Attorney
Danielle Pensley (Alaska Bar #1406054)
Deputy City Attorney
800 Cushman Street
Fairbanks, AK 99701
Tel.: 907.459.6750
Fax: 907.459.6761
E-mail: pewers@fairbanks.us
E-mail: dpensley@fairbanks.us

*/s/ Richard W. Head*
Richard W. Head (NH Bar #7900)
*(pro hac vice application pending)*
Of Counsel
SL ENVIRONMENTAL LAW GROUP PC
201 Filbert Street, Suite 401
San Francisco, CA 94133
Tel.: 415.348.8300
Fax: 415.384.8333
E-mail: rhead@slenvironment.com

*/s/ Kevin J. Madonna*
Kevin J. Madonna
*(pro hac vice application pending)*
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road
Hurley, NY 12443
Tel.: 845.481.2622
Fax: 845.230.3111
Email: kmadonna@kennedymadonna.com

DATED: April 26, 2019

20
Case 4:19-cv-00013-JWS   Document 1   Filed 04/26/19   Page 20 of 20